UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ARCHDIOCESE OF ST. LOUIS and ) <br> CATHOLIC CHARITIES OF ST. LOUIS, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> SYLVIA M. BURWELL[1], in her official ) <br> capacity as Secretary, United States ) <br> Department of Health and Human ) <br> Services, et al., ) <br> ) <br> Defendants. ) | No. 4:13-CV-2300-JAR |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction and Request for Oral Argument.[2] (Doc. No. 48) The motion is fully briefed and ready for disposition. On June 13, 2014 and June 26, 2014, Defendants filed Notices of Supplemental Authority related to the pending motion for preliminary injunction. (Doc. Nos. 56, 57)

### I.  Background

This action is one of many cases filed throughout the United States challenging a provision of the Affordable Care Act ("ACA")[3] and the regulations issued under it, which mandate that certain employers provide health coverage for contraceptives to their employees, or

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Sylvia M. Burwell has been substituted in her official capacity for Kathleen Sebelius as Secretary of Health and Human Services.

[2] Plaintiffs' request for oral argument on their motion for preliminary injunction will be denied. The parties have thoroughly briefed the motion and the Court has determined it can resolve the issues presented without the need for oral argument.

[3] Patient Protection and Affordable Care Act, Pub.L. No. 111–148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act, Pub.L. No. 111–152, 124 Stat. 1029 (2010).

face fines for failing to do so. The relevant statutory and regulatory background of the ACA has been set out in detail in several recent opinions. See, e.g., Michigan Catholic Conference and Catholic Family Services v. Burwell, 2014 WL 2596753, at *2-3 (6th Cir. Jun. 11, 2014); The Catholic Benefits Association LCA v. Sebelius, 2014 WL 2522357, at *1-3 (W.D. Okla. June 4, 2014); The Roman Catholic Archdiocese of Atlanta v. Sebelius, 2014 WL 1256373, at *2-4 (N.D.Ga. Mar. 26, 2014).

Briefly, under the ACA, "employment-based group health plans covered by the Employee Retirement Income Security Act (ERISA) must provide certain types of preventive health services." Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1122 (10th Cir.2013), *aff'd sub nom.* Burwell v. Hobby Lobby Stores, Inc., -- S.Ct. --, 2014 WL 2921709 (Jun. 30, 2014) (citing 42 U.S.C. § 300gg–13; 29 U.S.C. § 1185(d)). The provision of the ACA at issue, herein referred to as the contraceptive mandate, "mandates coverage, without cost-sharing by plan participants or beneficiaries, of 'preventive care and screenings' for women 'as provided for in comprehensive guidelines supported by the Health Resources and Services Administration.'" Id. (citing 42 U.S.C. § 300gg–13(a)(4)). The scope of "preventive care" includes "[a]ll Food and Drug Administration approved contraceptive methods[4], sterilization procedures, and patient education and counseling for all women with reproductive capacity." Health Resources & Services Administration, "Women's Preventive Services Guidelines," www.hrsa.gov/womensguidelines (last visited June 29, 2014).

The mandate exempts "religious employers" from the contraceptive requirement. Hobby Lobby, 723 F.3d at 1123. This exemption is limited, however, and includes only "churches,

---

[4] FDA-approved contraceptive methods include oral contraceptives, the so-called morning after pill, also known as Plan B, the so-called week after pill, also known as Ella, and intra uterine devices. Catholic Benefits Ass'n, 2014 WL 2522357, at *10 fn.3 (citing Food & Drug Administration, "Birth Control: Medicines to Help You," www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm (last visited June 29, 2014).

synagogues, mosques, and other houses of worship, and religious orders." Diocese of Cheyenne v. Sebelius, 2014 WL 1911873, at *2 (D.Wyo. May 13, 2014) (quoting 78 Fed.Reg. 8456, 8461 (Feb. 6, 2013)).

The mandate also includes an "accommodation" for certain non-exempt employers who do not want to provide coverage for the required contraceptive services based on religious objections. See 45 C.F.R. § 147.131(b). Id. A non-exempt employer is eligible for this accommodation if it satisfies the following requirements:

(1) it opposes providing coverage for some or all of the required contraceptive services due to religious objections;

(2) it is a nonprofit entity;

(3) it "holds itself out as a religious organization;" and

(4) it "self-certifies, in a form and manner specified by the Secretaries of Health and Human Services and Labor, that it satisfies the [previous three] criteria."

29 C.F.R. § 2590.715–2713A(a)(1)-(4).

To meet this last requirement, self-certification, an employer must provide the self-certification form to its insurance company, or, if the employer has a self-insured health plan (as is the case here), to its third-party administrator ("TPA"). 26 C.F.R. § 54.9815–2713A(b)–(c); 29 C.F.R. § 2590.715–2713A(b)–(c); 45 C.F.R. § 147.131(c); 78 Fed.Reg. at 39,878–79. The law then requires the TPA to provide or arrange separate payments for contraceptive products and services, without participation, payment, or interference from the eligible organization. 26 C.F.R. § 54.9815–2713A(b)–(d); 29 C.F.R. § 2590.715–2713A(b)–(d); 45 C.F.R. § 147.131(c)-(d); 78 Fed.Reg. at 39,878–80. The TPA is reimbursed for the costs it incurs when it provides such coverage. See 45 C.F.R. 156.50(d)(3)(ii).

If an employer subject to the contraceptive mandate fails to provide the required contraceptive coverage in its health plan, then the employer faces fines of $100 per day per employee, or up to $36,500 per year per employee. 26 U.S.C. § 4980D(b)(1). Further, if the employer fails to provide any health plan whatsoever to its employees, then the employer faces fines of $2,000 per year per full time employee (less 30 employees). 26 U.S.C. § 4980H(a), (c)(1).

Plaintiffs, the Archdiocese of St. Louis ("Archdiocese") and Catholic Charities of St. Louis ("Catholic Charities"), describe themselves as Catholic entities "that provide a wide range of spiritual, educational, and social services to members of the greater St. Louis community, Catholic and non-Catholic alike." (Compl., Doc. No. 1, ¶ 2) Catholic Church teachings uphold the firm conviction that sexual union should be reserved to married couples who are open to the creation of life; thus, artificial interference with the creation of life, including through abortion, sterilization, and contraceptives, is contrary to Catholic doctrine. (Id., ¶ 4) The Archdiocese operates a self-insured health plan that encompasses not only individuals directly employed by the Archdiocese itself, but also individuals employed by affiliated Catholic organizations, including Catholic Charities. (Id., ¶ 12) Consistent with Church teachings, the Archdiocese's plan does not cover abortion-inducing drugs, sterilization, or contraceptives. (Id., ¶ 39) The Archdiocese is exempt from the contraceptive mandate as a religious employer. (Id., ¶ 12) Catholic Charities is eligible for the "accommodation" as a nonprofit religious organization that objects to providing coverage for contraceptive services. (Id., ¶ 10)

Plaintiffs have brought this action against the Secretary of the United States Department of Health and Human Services, along with other government officials and agencies ("the Government"), alleging that the contraceptive mandate violates their rights under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb *et seq.*, the First Amendment, and the

Administrative Procedure Act. Plaintiffs also allege claims for interference with internal church governance and erroneous interpretation of regulations by the Government.

On May 8, 2014, Plaintiffs moved for a preliminary injunction against the Government's enforcement of the contraceptive mandate against them in light of the July 1, 2014 mandate, when their new plan year begins for its employee group health plan. The motion was fully briefed on May 30, 2014. On June 13 and June 26, 2014, Defendants filed Notices of Supplemental Authority related to the pending motion for preliminary injunction.

## II. Legal standard

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506–07 (1959). A district court has broad discretion when ruling on a request for injunction. Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 893 (8th Cir. 2013). In determining whether a preliminary injunction should be issued, a district court must consider: (1) the threat of irreparable harm to the movant, (2) the balance between this harm and the harm to the other party if the injunction is granted, (3) the probability of movant's success on the merits, and (4) the public interest. Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir.1981).

## III. Discussion

### A. Standing

In its opposition to Plaintiffs' motion for preliminary injunction, the Government challenges Plaintiffs' standing. To establish standing, Plaintiffs "must show an injury that is (1) concrete, particularized, and actual or imminent; (2) fairly traceable to the challenged action; and (3) redressable by a favorable ruling." Hobby Lobby, 723 F.3d at 1126 (quoting Clapper v. Amnesty Int'l USA, 133 S.Ct. 1138, 1147 (2013) (internal quotation omitted). The first element

requires that Plaintiffs "must have suffered an 'injury in fact'- an invasion of a legally protected interest." See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

The asserted injury in this case flows from the mandate's requirement that Plaintiffs provide, pay for, and/or facilitate access to insurance coverage for contraceptive services, including contracting with a TPA that will, as a result, provide or procure contraceptive products and services to Plaintiffs' employees. Likewise, Plaintiffs object to being forced to take other actions that facilitate access to the products and services they believe to be objectionable, including the self-certification requirement.

The Government argues it has no ERISA authority to require a church plan to contract with a TPA to provide contraceptive coverage or compel a TPA to provide contraceptive coverage after it agrees to enter into a contract with the Plaintiffs and receives the self-certification form.[5] (Doc. No. 52, p. 2) Thus, Plaintiffs cannot demonstrate an injury in fact since the regulations will not actually force Plaintiffs' TPA to provide coverage for the objectionable services.

A number of courts have already addressed the standing argument the Government raises here and rejected it, reasoning that it is the *fact* of the requirement that is important, not whether the Government will or will not choose to enforce it. In Roman Catholic Archdiocese of New York, 2013 WL 6579764 (E.D.N.Y. Dec. 16, 2013), the district court analyzed the plaintiffs' injury in fact as follows:

---

[5] Under the ACA regulations, Defendants may enforce the contraceptive mandate against TPAs through ERISA's enforcement authority. See 78 Fed.Reg. at 39,879–39,880. However, self-insured, church sponsored health care plans ("church plans") are specifically excluded from ERISA. See 29 U.S.C § 1003(b)(2). (Doc. No. 52, p. 2) Curiously, Defendants assert that Plaintiffs state "for the first time that they have a 'self-insured church plan'" in their motion for preliminary injunction. (Doc. No. 52, p. 2) In the complaint, however, Plaintiffs state "the Archdiocese operates a self-insurance plan that encompasses not only individuals directly employed by the Archdiocese itself, but in addition, individuals employed by affiliated Catholic organizations ..." (Compl., ¶¶ 12, 38)

> [P]laintiffs' alleged injury is that the [m]andate renders them complicit in a scheme aimed at providing coverage to which they have a religious objection. This alleged spiritual complicity is independent of whether the scheme actually succeeds at providing contraceptive coverage. It is undisputed that all of the non-exempt plaintiffs will still have to either comply with the mandate and provide the objectionable coverage or self-certify that they qualify for the accommodation. Plaintiffs allege that their religion forbids them from completing this self-certification, because to them, authorizing others to provide services that plaintiffs themselves cannot is tantamount to an endorsement or facilitation of such services. Therefore, regardless of the effect on plaintiffs' TPAs, the regulations still require plaintiffs to take actions they believe are contrary to their religion. As for the plaintiffs that qualify for the religious employer exemption, plaintiffs allege that the[y] ... will have to choose between complying with the [m]andate by providing the objectionable coverage or ejecting their non-exempt affiliates from their health plans. Leaving aside for now the merits of these claims, as a court must, ... plaintiffs have adequately alleged an injury-in-fact.

Id. at *7.

Likewise, in Roman Catholic Archdiocese of Atlanta v. Sebelius, 2014 WL 1256373, at *23 (N.D.Ga. Mar. 26, 2014), the district court instructed that "[i]t is, at the core, irrelevant whether the government has the authority to enforce the contraceptive mandate against a TPA which undertakes to provide coverage for preventive care, and there is no legitimate basis to speculate that the TPA will not provide coverage offensive to the Plaintiffs here. That a TPA of a church plan may voluntarily comply with the contraceptive mandate and ultimately provide contraceptive services underscores the legitimacy and reality of Plaintiffs' concern that the self-certification form causes them to be complicit in a scheme to provide contraceptive services, devices and products that violate their longstanding and deeply-help religious beliefs." See also, Catholic Diocese of Beaumont v. Sebelius, 2014 WL 31652, at *5 (E.D.Tex. Jan. 2, 2014); Reaching Souls Int'l, Inc. v. Sebelius, 2013 WL 6804259, at *7 (W.D. Okla. Dec. 20, 2013). Cf. Roman Catholic Archbishop of Washington v. Sebelius, 2013 WL 6729515, at *25-26 n. 22 (D.D.C. Dec. 20, 2013), *injunction pending appeal granted*, No. 13-5371 (D.C. Cir. Dec. 31, 2013).

As discussed in detail in these cases, Plaintiffs' injury is not related to whether the TPA can be penalized for noncompliance with the mandate. Rather, Plaintiffs' injury arises when the provision of contraceptive coverage has been facilitated by their actions and their beliefs have thereby been violated. This constitutes a sufficient injury to satisfy the constitutional minimum of standing. Reaching Souls Intern., 2013 WL 6804259 at *5.

### B. Likelihood of success[6]

"[P]arties moving to preliminarily enjoin a statute or regulation must establish that they are 'likely to prevail on the merits,' because such promulgations came about by a 'presumptively reasoned democratic process [ ].' " Barrett v. Claycomb, 705 F.3d 315, 321 n. 4 (8th Cir. 2013) (quoting Planned Parenthood Minn. v. Rounds, 530 F.3d 724, 732 (8th Cir.2008) (en banc) ("If the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh the other Dataphase factors."); Shrink Mo. Government PAC v. Adams, 151 F.3d 763, 765 (8th Cir.1998) (describing this consideration as the most important of the four factors).

#### 1. RFRA

A plaintiff establishes a prima facie case under RFRA by showing the government's action is (1) a substantial burden on (2) a sincere (3) religious exercise. Hobby Lobby, 723 F.3d at 1125-26. If a prima facie case is established, the burden then shifts to the government to show that application of the burden to the person - the particular claimant whose sincere exercise of religion is being substantially burdened – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. Id. at 1126 (quoting Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418,

---

[6] The parties agreed to incorporate by reference their summary judgment briefing with respect to the likelihood of success element for a preliminary injunction. (Doc. No. 49, p. 5 n.2)

420 (2006). Notably, even at the preliminary injunction stage, RFRA's burden shifting approach applies. Id. (citing Gonzales, 546 U.S. at 429).

### (a) Substantial burden

Under RFRA, an act by the government imposes a substantial burden on religious exercise if it "(1) requires participation in an activity prohibited by a sincerely held religious belief, (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent ... to engage in conduct contrary to a sincerely held religious belief." Catholic Benefits Ass'n LCA v. Sebelius, 2014 WL 2522357, at *6-7 (W.D.Okla. June 4, 2014) (quoting Hobby Lobby, 723 F.3d at 1138). The term "substantial burden" is not defined by RFRA; however, the plain meaning of "substantial" suggests the burden on religious exercise must be more than insignificant or remote, and case law confirms this common-sense conclusion. O'Brien v. U.S. Dept. of Health and Human Services, 894 F.Supp.2d 1149, 1158 (E.D.Mo. 2012) (citing Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir.2004) ("[A] substantial burden must place more than an inconvenience on religious exercise; a substantial burden is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly.") See also The Roman Catholic Archdiocese of Atlanta, 2014 WL 1256373, at *10 ("The Court evaluates, on the facts of this case, whether the regulations put "substantial pressure" on the Plaintiffs to modify their behavior and violate their sincerely held religious beliefs.").

Plaintiffs assert their Catholic beliefs prohibit them from "providing, paying for, and/or facilitating access to abortion-inducing products, contraception, or sterilization, including by contracting with an insurance company or third-party administrator that will, as a result, provide or procure the objectionable products and services to Plaintiffs' employees." (Compl., ¶ 106) In

addition, Plaintiffs object to being forced to take other actions that facilitate access to the objectionable products and services, including the mandate's self-certification requirement. (Id.)

The Archdiocese contends that pursuant to the contraceptive mandate, it must either (1) sponsor a plan that will provide, pay for, and/or facilitate the provision of the objectionable products and services to the employees of Catholic Charities and other organizations, or (2) no longer extend its plan to these organizations, subjecting them to substantial financial penalties if they do not contract with another insurance provider that will provide coverage. (Id., ¶ 12) In turn, Catholic Charities contends that its self-certification triggers or initiates a process resulting in the provision of the objectionable products and services to its employees, contrary to its religious beliefs. (Id., ¶ 11)

The Government does not appear to dispute that Plaintiffs' beliefs are sincerely held religious beliefs or that their opposition to the contraceptive mandate is a religious exercise. Rather, the Government contends the challenged regulations do not impose a substantial burden on their exercise of religion. (Doc. No. 24-1, p. 10) The Archdiocese is entirely exempt from the contraceptive coverage mandate, and Catholic Charities, as an eligible organization, need only self-certify that it objects to providing coverage for contraceptive services and provide that self-certification to its TPA, a de minimus burden. (Id., pp. 11-16) The Government characterizes Plaintiffs' claim as similar to the one rejected in Kaemmerling v. Lappin, 553 F.3d 669 (D.C. Cir. 2008). (Id., p. 12) There, the plaintiff, a federal prisoner, claimed the collection of DNA samples from him "defile[d] God's temple" in violation of his Free Exercise rights. Id. at 677. The court concluded that Kaemmerling did "not allege facts sufficient to state a substantial burden on his religious exercise because he cannot identify any 'exercise' which is the subject of

the burden to which he objects." Id. at 679. His only objection was directed at the independent actions of a third party, the FBI, not his own actions.

Plaintiffs respond that the Government's argument reflects a misunderstanding of their religious objection, which is directed not only to using contraceptives, but also to taking actions that facilitate their use. (Doc. No. 38, p. 18) The mandate requires Plaintiffs to either provide a health care plan that includes the required coverage or authorize the provision of those services through self-certification, acts they are required to perform independent of any third party's act. (Id., pp. 11-12) Plaintiffs argue they cannot avoid these requirements without subjecting themselves to significant financial penalties. (Id., p. 12)

Defendants further argue that even if the regulations were found to impose more than a de minimus burden on Plaintiffs' exercise of religion, any such burden would be far too attenuated to be "substantial" under RFRA. (Id., pp. 16-19) In other words, the services to which Plaintiffs object will only be provided if one of their employees independently requests the services. In the event such a request is made, the regulation prohibits any costs of those services, directly or indirectly, to be imposed on Plaintiffs.

Plaintiffs respond that the touchstone of the substantial burden analysis is whether they are compelled to act in violation of their religious beliefs. RFRA contains no requirement that the actions required of Plaintiffs be "significant" or "substantial" – "any exercise of religion" is protected. (Id., pp. 13-14) Moreover, it is not the Court's role to determine whether facilitating access to contraceptive services violates Plaintiffs' religious beliefs. (Id., pp. 15-18)

The case law on this issue is quickly developing. Plaintiffs note that the vast majority of courts faced with similar challenges have enjoined enforcement of the contraceptive mandate, holding that religious entities in similar challenges have shown a likelihood of success on their

RFRA claims. See, e.g., Ave Maria Foundation v. Sebelius, 2014 WL 117425 (E.D. Mich. Jan. 13, 2014); Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs., 2013 WL 6858588 (E.D. Mo. Dec. 30, 2013); Diocese of Fort Wayne-S. Bend, Inc. v. Sebelius, 2013 WL 6843012 (N.D. Ind. Dec. 27, 2013); S. Nazarene Univ., 2013 WL 6804265; Geneva Coll. v. Sebelius, 2013 WL 6835094 (W.D. Pa. Dec. 23, 2013); Legatus v. Sebelius, 2013 WL 6768607 (E.D. Mich. Dec. 20, 2013); The Roman Catholic Archdiocese of New York, 2013 WL 6579764; Zubik v. Sebelius, 2013 WL 6118696 (W.D.Pa. Nov. 21, 2013). (Doc. No. 38, p. 9, n.1).[7] C.f., Charities of the Archdiocese of Philadelphia v. Burwell, 2014 WL 2892502 (E.D. Pa. Jun. 26, 2014); Wheaton College v. Burwell, 2014 WL 2826336 (N.D.Ill. Jun. 23, 2014); Michigan Catholic Conf. v. Burwell, 2014 WL 2596753 (6th Cir. Jun. 11, 2014); University of Notre Dame v. Sebelius, 743 F.3d 547 (7th Cir. 2014); Diocese of Cheyenne v. Sebelius, 2014 WL 1911873 (D.Wyo. May 13, 2014); Priests for Life v. United States Department of Health and Human Services, 2013 WL 6672400 (D.D.C. Dec. 19, 2013).

Most recently in Colorado Christian Univ., 2014 WL 2804038, the district court examined two competing cases, Zubik, 2013 WL 6118696 and Univ. of Notre Dame, 743 F.3d 547. In Zubik, the district court agreed with the plaintiffs that the affirmative act of signing the exemption form and delivering it to a TPA ("the accommodation") was an action which imposes a substantial burden on their exercise of religion:

> [A]lthough the "accommodation" legally enables Plaintiffs to avoid directly paying for the portion of the health plan that provides contraceptive products, services, and counseling, the "accommodation" requires them to shift the responsibility of purchasing insurance and providing contraceptive products, services, and counseling, onto a secular source. The Court concludes that Plaintiffs have a sincerely-held belief that "shifting responsibility" does not absolve or exonerate them from the moral turpitude created by

---

[7] More recent cases include Colorado Christian University v. Sebelius, 2014 WL 2804038 (D.Colo. June 20, 2014); Catholic Benefits Ass'n, 2014 WL 2522357; Dobson v. Sebelius, 2014 WL 1571967 (D. Colo. Apr. 17, 2014); and Roman Catholic Archdiocese of Atlanta, 2014 WL 1256373. While none of these rulings are binding on this Court, the Court finds them persuasive.

the "accommodation"; to the contrary, it still substantially burdens their sincerely-held religious beliefs.

Colorado Christian University, 2014 WL 2804038 at *5 (quoting Zubik, 2013 WL 6118696, at *25).

In Notre Dame, the Seventh Circuit concluded that execution and delivery of the exemption form does not trigger or enable the objectionable coverage and does not constitute a substantial burden on religion under RFRA:

> The accommodation in this case consists in the organization's (that is, Notre Dame's) washing its hands of any involvement in contraceptive coverage, and the insurer and the third-party administrator taking up the slack under compulsion of federal law. Notre Dame is telling [its health insurance providers]: "we're excused from the new federal obligation relating to contraception," and in turn, the government tells those insurance companies "but you're not." This is a warning, not a trigger. It enables nothing. The sole "enabler" is the federal statute that Notre Dame has been allowed to opt out of.
> ...
> The delivery of a copy of the form to [a health insurance provider] reminds it of an obligation that the law, not the university, imposes on it - the obligation to pick up the ball if Notre Dame decides, as is its right, to drop it. Notre Dame's signing the form no more "triggers" [the health insurance provider]'s obligation to provide contraceptive services than a tortfeasor's declaring bankruptcy "triggers" his co-tortfeasors' joint and several liability for damages. [The health insurance provider] must provide the services no matter what; signing the form simply shifts the financial burden from the university to the government.

Colorado Christian University, 2014 WL 2804038 at *6 (quoting Notre Dame, 743 F.3d at 555, 557).

After careful review, Judge Blackburn adopted the district court's reasoning in Zubik. Noting that analysis of the burden imposed on a plaintiff's religious beliefs can begin to "bleed" into an assessment of the validity or credibility of those beliefs or the sincerity of those beliefs, he ruled that such an assessment is not appropriate, particularly where the sincerity of the plaintiff's beliefs is conceded. 2014 WL 2804038, at *6. "Courts may still evaluate whether a law pressures a litigant to modify her behavior and whether that pressure is significant. But

having conceded that the accommodation requires Plaintiffs to change their behavior in some way –here, by executing a certification – the government cannot then label that newly required action as trivial. It is not the government's business to decide what behavior has religious significance. Only when a law or regulation requires no action or forbearance by a religious objector can the government dismiss otherwise significant burdens on religious exercise offhand." Id. at *7 (quoting Ave Maria Foun., 2014 WL 117425, at *5).

This Court agrees with the reasoned opinion of Judge Blackburn. Plaintiffs have a sincere religious belief that artificial interference with the creation of life, including through abortion, sterilization and contraceptives is contrary to Catholic doctrine. By requiring Plaintiffs to choose between providing contraceptive coverage to their employees and paying substantial financial penalties if they refuse to do so, the mandate applies substantial pressure on Plaintiffs to engage in conduct contrary to their religious beliefs. Therefore, Plaintiffs have established a substantial burden under RFRA. Catholic Benefits Ass'n, 2014 WL 2522357, at *8 (citing Hobby Lobby, 723 F.3d at 1142; S. Nazarene Univ., 2013 WL 6804265, at *8).

**(b) Compelling interest**

Because Plaintiffs have demonstrated a substantial burden on their religious exercise, the Government must show the mandate is the "least restrictive means of furthering a compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The Government advances two compelling interests: the "promotion of public health" and "assuring that women have equal access to health care services," i.e., gender equality. (Doc. No. 24-1, pp. 19-21) There is no question that promoting public health and gender equality are of "tremendous societal significance." Conestoga Wood Specialties Corp. v. Secretary of U.S. Dept. of Health and Human Services, 724 F.3d 377, 412 (3rd Cir. 2013), rev'd sub nom. Burwell v. Hobby Lobby Stores, Inc., -- S.Ct. -

-, 2014 WL 2921709 (Jun. 30, 2014). "The Government can certainly claim "a compelling interest in safeguarding the public health by regulating the health care and insurance markets." Id. (quoting Mead v. Holder, 766 F.Supp.2d 16, 43 (D.D.C.2011)). Moreover, given the "undoubted importance, both to the individual and to society, [to] remov[e] the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women, … there is a compelling interest in "[a]ssuring women equal access to ... goods, privileges, and advantages" enjoyed by men." Id. (internal citations omitted).

Indeed, Congress enacted the contraceptive mandate because "women have different health needs than men, and these needs often generate additional costs." Michigan Catholic Conf., 2014 WL 2596753, at *2 (quoting 155 Cong. Rec. 29049, 29070 (Dec. 2, 2009) (statement of Sen. Feinstein)). Prior to the ACA, "[w]omen of childbearing age spent 68 percent more in out-of-pocket health care costs than men." Id. These disproportionately high costs discouraged women from seeking treatment: "[w]omen are more likely than men to neglect care or treatment because of cost." Id. (quoting 155 Cong. Rec. S11985, S11987 (daily ed. Nov. 30.2009) (statement of Sen. Mikulski)). The ACA thus requires coverage for, "with respect to women, such additional preventive care and screenings ... as provided for in comprehensive guidelines supported by the Health Resources and Services Administration." Id. (quoting 42 U.S.C. § 300gg–13(a)(4); Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services under the Patient Protection and Affordable Care Act, 77 Fed.Reg. 8725–01, 8725 (Feb. 15, 2012) (to be codified at 29 C.F.R. pt. 2590; 45 C.F.R. pt. 147). See also, Univ. of Notre Dame, 743 F.3d at 549 ("Because out-of-pocket expenditures on female contraceptives can be substantial for many women, providing contraceptives without cost to the user can be

expected to increase contraceptive use and reduce the number of unintended pregnancies and of abortions ... [W]omen who can successfully delay a first birth and plan the subsequent timing and spacing of their children are more likely than others to enter or stay in school and to have more opportunities for employment and for full social or political participation in their community.") These are not "broadly formulated interests justifying the general applicability of government mandates," Gonzales, 546 U.S. at 431, but rather concrete and specific interests supported by empirical evidence.

Plaintiffs argue the Government has not shown its interests would be seriously undermined by granting them an exemption from the mandate, particularly given the numerous exemptions the Government has already made for what it defines as "religious employers," as well as for grandfathered plans and employers with less than fifty employees. (Doc. No. 38, pp. 21-24) These limited exemptions do not, in the Court's opinion, necessarily undermine the Government's interests and instead reflect the Government's attempts to balance the competing interests at stake. "Even a compelling interest may be outweighed in some circumstances by another even weightier consideration."[8] Burwell, --S.Ct.--, 2014 WL 2921709. Accordingly, the Court finds the Government's interests in promoting public health and gender equality are compelling within the meaning of RFRA and that the contraceptive mandate furthers those interests.

(c) **Least restrictive means**

---

[8] The Supreme Court noted in particular that the interest served by the exception for grandfathered plans is simply the interest of employers in avoiding the inconvenience of amending an existing plan. "Grandfathered plans are required 'to comply with a subset of the [ACA]'s health reform provisions' that provide what HHS has described as 'particularly significant protections' ... But the contraceptive mandate is expressly excluded from this subset." Burwell, --S.Ct.--, 2014 WL 2921709 (internal citation omitted). The Supreme Court assumed without deciding that the Government has a compelling interest in providing women FDA-approved contraception at no cost, and proceeded to consider whether the Government had shown that the contraceptive mandate was the least restrictive means of furthering that interest. Id.

However, this Court cannot see how the mandate is the *least* restrictive means to further the Government's compelling interests. The least restrictive means inquiry is "exceptionally demanding," see Burwell, --S.Ct.--, 2014 WL 2921709 (citing City of Boerne v. Flores, 521 U.S. 507, 532 (1997), and involves "comparing the cost to the government of altering its activity to continue unimpeded versus the cost to the religious interest imposed by the government activity." Ave Maria Foun., 2014 WL 117425, at *7 (quoting S. Ridge Baptist Church v. Indus. Comm'n of Ohio, 911 F.2d 1203, 1206 (6th Cir.1990)). Plaintiffs suggest several alternative means by which the Government could provide contraceptive services without burdening their religious exercise, including providing the coverage directly to Plaintiffs' employees, or through grants or tax credits. (Doc. No. 38, pp. 31-32) The Court notes these options have been recognized as feasible alternatives by other courts. Roman Catholic Archdiocese of New York, 2013 WL 6579764, at *18 (citing Korte v. Sebelius, 735 F.3d 654, 686 (7th Cir. 2013)). See also, East Texas Baptist Univ., 2013 WL 6838893, at *24. Indeed, the Supreme Court has observed that the most straightforward way for the Government to achieve its goal without imposing a substantial burden on the exercise of religion would be to assume the cost of providing contraceptives to any women unable to obtain them under their health insurance policies due to their employers' religious objections. Burwell, --S.Ct.--, 2014 WL 2921709.

The Government argues it considered Plaintiffs' alternative and determined it was not feasible because "the agencies lacked statutory authority to implement it, it would impose considerable new costs and other burdens on the government, and it would otherwise be impracticable." (Doc. No. 24-2, p. 26) (citing 78 Fed.Reg. at 39,888). This exact argument was considered and rejected by the district court in Ave Maria Foun.:

> First, the government's assertion that it would need additional statutory authority misses the point of the compelling interest test, which probes whether the government as a whole

could have acted differently ... And second, the government is not persuasive in attempting to convince that implementing the plaintiffs' proposals would entail great expense. The government's only support is a portion of the administrative record that explains other proposals were considered and deemed less effective ... Without somehow quantifying the loss of effectiveness, the government cannot show that the [mandate] is the least restrictive means of promoting public health and gender equality in light of the numerous other options available and the myriad of exceptions to it.

2014 WL 117425, at *9 (internal citations omitted). Similarly, the Court finds the Government has not met its burden under RFRA to show that application of the mandate to Plaintiffs is the least restrictive means of furthering its compelling interests.

In summary, Plaintiffs have shown they are likely to succeed on their RFRA claim. Having so found, the Court need not address this factor as to Plaintiffs' remaining claims. Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.") (internal citations omitted).

### C. Irreparable harm

Regardless of the strength of its claim on the merits, a movant for preliminary injunctive relief must show a threat of irreparable harm. See Dataphase, 640 F.2d at 113 ("the likelihood that plaintiff ultimately will prevail is meaningless in isolation . . . [and] must be examined in the context of the relative injuries to the parties and the public."). Establishing a likely RFRA violation satisfies the irreparable harm factor. Hobby Lobby, 723 F.3d at 1146.

### D. Balance of harms

The balance of harms analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public. Noodles Development, LP v. Ninth Street Partners, LLP, 507 F.Supp.2d 1030, 1038-39 (E.D.Mo. 2007) (internal citations omitted). The Court finds the harm to Plaintiffs without the

injunction outweighs any harm to the Government's interest in carrying out the mandate. As noted in Hobby Lobby, the Government has already granted an exemption from the contraceptive mandate to many religious organizations. And while a preliminary injunction would prevent the Government from requiring that health insurance of Plaintiffs' employees provide coverage for contraceptive services, other coverages required by the Preventative Care Coverage Requirement would not be affected. Colorado Christian Univ., 2014 WL 2804038, at *8. Conversely, absent an injunction, Plaintiffs remain subject to a requirement that likely constitutes a violation of their rights under federal law. Id.; Reaching Souls Intern., Inc., 2013 WL 6804259, at *8. Thus, the balance of equities weighs in favor of Plaintiffs.

### D. Public interest

Finally, in light of the current legal uncertainty regarding the enforceability of the contraceptive mandate as to nonprofit organizations with religious objections, see, Little Sisters of the Poor v. Sebelius, 134 S.Ct. 1022 (2014) (remanding to the Tenth Circuit and enjoining defendants from enforcing the contraceptive mandate during the pendency of the appeal, so long as plaintiffs submit written objections based on religious beliefs directly to the Secretary of Health and Human Services), the Court finds it in the public interest to preserve the status quo and enjoin enforcement of the mandate until Plaintiffs' claims are resolved. Reaching Souls Intern., 2013 WL 6804259, at *8.

Accordingly,

**IT IS HEREBY ORDERED THAT** Plaintiff's Motion for Preliminary Injunction [48] is **GRANTED**.

**IT IS FURTHER ORDERED THAT** Defendants, their agents, officers, and employees, and all others in active concert or participation with them, are hereby **ENJOINED AND**

**RESTRAINED** from any application or enforcement against the Plaintiffs of the substantive requirements at issue in this case imposed by 42 U.S.C. § 300gg-13(a)(4) and its related regulations, including any penalties, fines and assessments for noncompliance with these provisions, until further order of the Court.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE

Dated this 30th day of June, 2014.